**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| LUIGI CRISPO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0666-KSJM |
| | ) | |
| ELON R. MUSK, X HOLDINGS I, | ) | |
| INC., AND X HOLDINGS II, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION**

Date Submitted: June 23, 2023
Date Decided: October 31, 2023

Michael Hanrahan, Samuel L. Closic, John G. Day, Robert B. Lackey, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Max Huffman, Joseph A. Pettigrew, SCOTT+SCOTT ATTORNEYS AT LAW LLP, San Diego, California; Justin O. Reliford, Jing-Li Yu, SCOTT+SCOTT ATTORNEYS AT LAW LLP, New York, New York; *Counsel for Plaintiff Luigi Crispo*.

Edward B. Micheletti, Lauren N. Rosenello, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Counsel for Defendants Elon R. Musk, X Holdings I, Inc., and X Holdings II, Inc.*

**McCORMICK, C.**

This decision addresses the question of whether a stockholder of a target company has third-party beneficiary status to sue for lost-premium damages under a merger agreement that expressly contemplates lost-premium damages. The question arises in a curious procedural context—on a petition for mootness fees, where the plaintiff-stockholder must demonstrate that his mooted claim was meritorious when filed. The short answer is that the plaintiff's claim was not meritorious when filed because either he did not have third-party beneficiary status or his third-party beneficiary rights had not yet vested. Thus, this decision denies the plaintiff's petition for mootness fees. The simplicity of the short answer runs the risk of masking the analytical complexity of the question presented. For a full account of this Gordian-knot of an issue and how the court cuts it, read on.

I.      **FACTUAL BACKGROUND**

On April 25, 2022, Elon R. Musk, X Holdings I, Inc., and X Holdings II, Inc. (collectively, "Defendants") agreed to acquire Twitter, Inc. pursuant to an Agreement and Plan of Merger (the "Merger Agreement").[1] On July 8, 2022, Defendants' counsel sent a letter to Twitter purporting to terminate the Merger Agreement.[2] On July 12, 2022, Twitter filed a complaint against Defendants in this court seeking specific enforcement of the Merger Agreement.[3] That filing launched highly expedited proceedings toward an October trial.[4] By October 3, 2022, Musk had changed his

---

[1] C.A. No. 2022-0666-KSJM, Docket ("*Crispo* Dkt.") 1 ("Compl.") ¶ 19.

[2] Compl. ¶ 55.

[3] *Twitter, Inc. v. Musk*, C.A. No. 2022-0613-KSJM, Docket ("*Twitter* Dkt.").

[4] *See id.*

mind again and decided to close on the original terms of the Merger Agreement.[5] On October 6, 2022, the court granted a stay of proceedings to allow Musk the opportunity to consummate the deal.[6] The deal closed on October 27, 2022.[7]

Before the deal closed, Plaintiff Luigi Crispo ("Plaintiff") held 5,500 shares of Twitter common stock.[8] He filed suit on July 29, 2022, asserting two causes of action.[9] Plaintiff claimed that Musk breached his fiduciary duties as a controller of Twitter and that Defendants breached the Merger Agreement.[10] Plaintiff sought specific performance and damages.[11]

Defendants moved to dismiss Plaintiff's complaint.[12] The parties fully briefed that motion as of September 8, 2022,[13] and the court held oral argument on September 19, 2022.

On October 11, 2022, the court issued a Memorandum Opinion dismissing most of Plaintiff's complaint (the "Dismissal Decision").[14] The Dismissal Decision held that Plaintiff had failed to state a claim for breach of fiduciary duty against Musk because

---

[5] *Twitter* Dkt. 698.

[6] *Twitter* Dkt. 715 at 1–2.

[7] *Twitter* Dkt. 729 at 1–2.

[8] Compl. ¶ 1.

[9] *Id.* ¶¶ 72–87.

[10] *Id.* ¶¶ 82–87.

[11] *Id.* ¶¶ 72–81.

[12] *Crispo* Dkt. 15.

[13] *Crispo* Dkt. 25.

[14] *See Crispo v. Musk*, 2022 WL 6693660, at *16 (Del. Ch. Oct. 11, 2022) (Dismissal Decision).

the complaint did not adequately allege that Musk controlled Twitter before the transaction closed.[15]

The Dismissal Decision further held that Plaintiff lacked standing to seek specific performance of the Merger Agreement.[16] The Dismissal Decision left open the possibility, however, that the damages provision in the Merger Agreement conveyed third-party beneficiary status to stockholders claiming damages for breach of the Merger Agreement.[17] The court permitted supplemental briefing on this point and held in abeyance consideration of Defendants' argument concerning Plaintiff's damages claim.[18] Supplemental briefing never occurred.

This action, presumed dead by many when Defendants closed the deal, sprung back to life zombie-like months later, when Plaintiff claimed partial credit for the deal's consummation and petitioned the court for mootness fees in the amount of $3 million.[19] Defendants opposed Plaintiff's petition.[20]

## II. LEGAL ANALYSIS

The Delaware Supreme Court has held that, to be entitled to mootness fees, a plaintiff must demonstrate that: (i) "the suit was meritorious when filed;" (ii) the action that produced the benefit to the corporation "was taken by the defendants

---

[15] *Id.* at *15–16.

[16] *Id.* at *11.

[17] *Id.*

[18] *Id.* at *16.

[19] Dkt. 43; Dkt. 47 ("Pl.'s Opening Br.") at 1.

[20] Dkt. 57 ("Defs.' Answering Br."); *see also* Dkt. 59 (Pl.'s Reply Br.).

before a judicial resolution was achieved;" and (iii) "the resulting corporate benefit was causally related to the lawsuit."[21]

Defendants dispute the first and third elements, arguing that Plaintiff's suit was not meritorious when filed and played no part in causing the deal to close. This decision holds that Plaintiff failed to demonstrate that his claim was meritorious when filed, thus he is not entitled to mootness fees. Because the first issue is dispositive, the court does not reach the issue of causation.

"In order for a suit to be considered meritorious when filed, the complaint must have been able to have survived a motion to dismiss, whether or not such a motion was filed."[22] Here, the Dismissal Decision narrowed the analysis by dismissing all but one of Plaintiff's claims pursuant to Court of Chancery Rule 12(b)(6).[23] For Plaintiff to prevail on his mootness fee petition, therefore, he must demonstrate that his sole remaining claim seeking lost-premium damages was meritorious when filed.

---

[21] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997) (citing *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980)).

[22] *BTZ, Inc. v. Nat'l Intergroup, Inc.*, 1993 WL 133211, at *2 (Del. Ch. Apr. 7, 1993) (citing *Chrysler Corp. v. Dann*, 223 A.2d 384, 387 (Del. 1966)).

[23] Plaintiff collaterally attacks the Dismissal Decision. He argues that his suit was moot as of the date that the court stayed the Twitter lawsuit to permit Musk to close, October 6, 2022, and thus the October 11 Dismissal Decision was advisory and without any effect on his current arguments. Pl.'s Opening Br. at 8–9. Of course, the mooting action was the closing, not the stay. The closing did not occur until 16 days after the court issued the decision, and it was far from clear when the court entered the stay that Musk would in fact close. But even if the court were to let Plaintiff reargue the issues resolved by the Dismissal Decision, it would not matter. This same jurist would reach the same conclusions reflected in the Dismissal Decision.

Plaintiff was not a party to the Merger Agreement, and so the merits of his claim hinge on the argument that he had standing to sue for breach of the agreement as a third-party beneficiary.[24] Although one provision of the Merger Agreement (Section 9.7) expressly disclaims third-party beneficiaries, a separate provision of the Merger Agreement (Section 8.2) states that, in the event of breach, the buyers will be liable for "the benefits of the transactions contemplated by this Agreement lost by the Company's stockholders . . . taking into consideration all relevant matters, including lost stockholder premium[.]"[25] This decision refers to the quoted language of Section 8.2 as the "Lost-Premium Provision."

The parties urge the court to draw diametrically different conclusions from the Lost-Premium Provision. Plaintiff invokes the general/specific canon of contractual interpretation to argue that the Lost-Premium Provision reflects the parties' intent to make stockholders third-party beneficiaries for the purpose of recovering lost-

---

[24] *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007) ("As a general rule, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions." (citing *Comrie v. Enterasys Networks, Inc.*, 2004 WL 293337, at *2 (Del. Ch. Feb. 17, 2004))); *see also Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2008 WL 4182998, at *4 (Del. Ch. Sept. 11, 2008) (same); *E.I. du Pont de Nemours & Co. v. MacDermid Printing Sols. L.L.C.*, 248 F.Supp.3d 570, 575 (D. Del. 2017) (same); *Madison Realty P'rs 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001) (same); *Triple C Railcar Serv., Inc. v. City of Wilm.*, 630 A.2d 629, 633 (Del. 1993) ("[A] third person, who is, in effect, a stranger to the contract, may enforce a contractual promise in his own right and name if the contract has been made for his benefit." (citing *Wilm. Housing Auth. v. Fidelity & Deposit Co. of Md.*, 47 A.2d 524 (Del. 1946))).

[25] Dkt. 15, Ex. A (Merger Agreement, cited as "Merger Agr.") § 8.2 (parentheses omitted).

5

premium damages.[26] Defendants dispute this, citing the Merger Agreement's no-third-party-beneficiaries provision and the general reticence of Delaware law to extend third-party beneficiary status to stockholders under corporate contracts.[27] They also point to secondary authorities reflecting transactional attorneys' belief that provisions like the Lost-Premium Provision were intended to rebalance the negotiation leverage threatened by *Consolidated Edison, Inc. v. Northeast Utilities* ("*Con Ed*")[28] while simultaneously avoiding the inefficiencies associated with granting stockholders third-party beneficiary status.[29]

The court's analysis of the parties' competing contractual interpretations proceeds in four parts. First, the court summarizes black-letter law governing third-party beneficiary status. Second, the court discusses considerations under Delaware law unique to stockholders claiming third-party beneficiary status. Third, the court discusses the Lost-Premium Provision and situates it in the context of *Con Ed* provisions. Last, the court addresses whether the Lost-Premium Provision grants stockholders third-party beneficiary status to seek lost-premium damages.

## A.    The Law Of Third-Party Beneficiaries

To allege standing as a third-party beneficiary, a plaintiff must plead that: "(i) the contracting parties . . . intended that the third party beneficiary benefit from

---

[26] *See* Pl.'s Opening Br. at 32–40.

[27] Defs.' Answering Br. at 9–10, 16.

[28] 426 F.3d 524 (2d Cir. 2005).

[29] Defs.' Answering Br. at 19–23.

6

the contract, (ii) the benefit [was] intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party [was] a material part of the parties' purpose in entering into the contract."[30]

"A third-party beneficiary's rights are measured by the terms of the contract."[31] The benefits conveyed to third parties need not be coterminous with the rights of the promisee; rather, parties to an agreement may expressly or impliedly limit the rights

---

[30] *Madison Realty*, 2001 WL 406268, at *5 (citing *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386–87 (Del. 1990)).

[31] *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 271–72 (Del. 2022) (citation omitted); *Rumsey Elec. Co. v. Univ. of Del.*, 358 A.2d 712, 714 (Del. 1976) (holding that "[p]laintiff's rights, springing from its status as a third party beneficiary of the performance bond, are 'measured by the terms of the agreement between the principals'" (quoting trial court)); *see also Restatement (Second) of Contracts* § 309 (Am. L. Inst. 1981) [hereinafter "*Restatement*"] ("Where there is a contract, the right of a beneficiary is subject to any limitations imposed by the terms of the contract."); 13 *Williston on Contracts* § 37:25 (4th ed.), Westlaw (database updated May 2023) [hereinafter "*Williston*"] (stating the third-party beneficiary's rights are "absolutely defined by the terms of the contract" (citing *Restatement* § 309)).

of a third-party beneficiary.[32] The parties can modify—expressly or impliedly—when those rights vest.[33]

The parties to the agreement may not modify or deprive the beneficiary of a vested right without the beneficiary's consent.[34] Once a right vests, a third-party beneficiary may enforce that right concurrently and without joining the promisee,[35]

---

[32] *See, e.g.*, *NAMA Hldgs., LLC*, 922 A.2d at 433 (finding third-party beneficiary had standing to bring a claim under one section of the contract only); *Restatement* § 309 ("Where there is a contract, the right of a beneficiary is subject to any limitations imposed by the terms of the contract."); 9 *Corbin on Contracts* § 46.5 at 115–16 (2007) [hereinafter "*Corbin*"] ("There can be no right in a third party beneficiary unless a contract was formed by the promisor and promisee and the beneficiary's rights are defined and limited by the contract that created those rights."); 3 E. Allan Farnsworth & Zachary Wolfe, *Farnsworth on Contracts* § 10.2 n.19 at 11 (4th ed. 2019) [hereinafter "*Farnsworth*"] ("A person may, of course, have a right to enforce some, but not all, of a promisor's duties under a contract." (citing *Nw. Airlines v. Crosetti Bros.*, 483 P.2d 70 (Or. 1971)).

[33] 3 *Farnsworth* § 10.10 at 74 ("[T]he contract may provide that the beneficiary's right is vested when it would not otherwise be, or that it is not vested when it would otherwise be.").

[34] *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *8 (Del. Ch. May 16, 2007) ("a contract benefiting a third party who has acted in reliance upon it cannot be amended to the detriment of the third party beneficiary without its consent" (citing *Restatement* § 311(3)); *see* 13 *Williston* § 37:59 ("Once the third party's right vested, the consent of the beneficiary should be a necessary prerequisite to any attempt by the contracting parties to alter or terminate the contract giving rise to the beneficiary's rights.").

[35] 9 *Corbin* § 46.1 at 99 (observing that, once a third-party beneficiary's rights vest then "[a] third party beneficiary has the same rights and remedies it would have enjoyed as a promisee of the contract"); 3 *Farnsworth* § 10.09 at 65 ("Once it is decided that a third party is an intended beneficiary, it follows that the party has a right against the promisor. The beneficiary can enforce that right without joining the promisee in an action against the promisor for damages or specific performance."); *Delmar News, Inc. v. Jacobs Oil Co.*, 584 A.2d 531, 534 (Del. Super. 1990) ("Where it is the intention of the promisee to secure a performance for the benefit of another . . . and the promisee makes a contract to do so, then such a third person has the right to enforce the contract against the promisor." (citing *Restatement* § 302 (1979)).

subject to the enforcement provisions of the contractual scheme.[36]  "[T]hird party beneficiaries," however, "cannot object to the alteration or termination of the contract before their rights against the promisor have vested."[37]

Contracting parties will often specify their intent as to third-party beneficiaries on the face of the agreement, typically by disclaiming an intent to convey third-party beneficiary status.  As this court has explained, a no-third-party-beneficiaries provision provides a helpful starting point for a court's consideration of the contracting parties' intent as to third-parties.[38]  And Delaware courts give no-third-party-beneficiaries provisions a non-trivial amount of weight.[39]

---

[36] *Cap. Gp. Cos., Inc. v. Armour*, 2004 WL 2521295, at *5 (Del. Ch. Oct. 29, 2004) (observing that third-party beneficiaries who seek to "reap the benefits" of a contractual scheme are bound by the enforceable provisions found in the agreement); *Javice v. JPMorgan Chase Bank, N.A.*, 2023 WL 4561017, at *2 n.2 (Del. Ch. July 13, 2023) ("a third-party beneficiary is bound by forum selection and other similar provisions when the third-party beneficiary seeks to enforce a right under the contract" (citing *NAMA Hldgs., LLC*, 922 A.2d at 431 ("[A] court will not allow a third-party beneficiary to cherry-pick certain provisions of a contract which it finds advantageous in making its claim, while simultaneously discarding corresponding contractual obligations which it finds distasteful.")); John Coyle & Robin Effron, *Forum Selection Clauses, Non-signatories, and Personal Jurisdiction*, 97 Notre Dame L. Rev. 187, 195 (2021) ("If a non-signatory has directly benefitted from one part of the agreement . . . he is estopped from arguing that he is not bound by a different provision in that same agreement.")).

[37] 13 *Williston* § 37:59 ("third party beneficiaries cannot object to the alteration or termination of the contract before their rights against the promisor have vested").

[38] *See Fortis Advisors LLC v. Meds. Co., & Melinta Therapeutics, Inc.*, 2019 WL 7290945, at *3–4 (Del. Ch. Dec. 18, 2019).

[39] *See id.*; *see also Capano v. Capano*, 2014 WL 2964071, at *13 (Del. Ch. June 30, 2014) (denying third-party beneficiary status where language of trust agreement "plainly articulates its drafter's intent to exclude third-party beneficiaries"); *United Rentals, Inc. v. RAM Hldgs., Inc.*, 2007 WL 4327770, at *1 (Del. Ch. Nov. 29, 2007) (denying third-party beneficiary status where "[t]he merger agreement explicitly

But no-third-party-beneficiaries provisions are not entitled to any special deference beyond that generally granted to contractual terms, and they do occasionally yield to contrary language in the contract consistent with standard rules of contract interpretation.[40] For example, Delaware courts will disregard a general no-third-party-beneficiaries provision where the contract includes more specific language demonstrating an intent to benefit a third party.[41] Under the general/specific canon, "[s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[42]

By contrast, Delaware courts have construed no-third-party-beneficiaries provisions that are customized by a carve-out as indicating a strong intent to disclaim third-party beneficiaries. When a provision is customized, this court has concluded

---

states that its only intended beneficiaries are the parties to the agreement themselves" (citation omitted))*; Kronenberg v. Katz*, 872 A.2d 568, 605–06 & n.74 (Del. Ch. 2004) (denying third-party beneficiary status where the "plain language" of the agreement disclaimed third-party beneficiary status unless "expressly provide[d]" for, finding the agreement did not "expressly provide for [the claimant] to benefit from its terms[,]" and noting that "parties may . . . expressly provide that a nonparty shall not have any rights as a third-party beneficiary").

[40] *See, e.g., Branin v. Stein Roe Inv. Counsel, LLC*, 2014 WL 2961084, at *10 n.69 (Del. Ch. June 30, 2014) (applying the canons of construction and rejecting the enforcement of a "boilerplate" no-third-party-beneficiaries provision).

[41] *See, e.g., Amirsaleh*, 2008 WL 4182998, at *5 (applying the canons of construction and rejecting a general no third-party-beneficiaries provision where the agreement specifically granted benefits to third-parties).

[42] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) (citing *Katell v. Morgan Stanley Gp., Inc.*, 1993 WL 205033, at *4 (Del. Ch. June 8, 1993)).

that the parties knew how to confer third-party beneficiary status and deliberately chose not to do so with respect to any unlisted groups.[43]

## B. Special Considerations Relating To Stockholders As Third-Party Beneficiaries

Delaware courts are reticent to confer third-party beneficiary status to stockholders under corporate contracts for a mix of doctrinal, practical, and policy reasons.[44]

One reason for this reticence is that conferring third-party beneficiary status to stockholders under corporate contracts runs counter to Delaware's board-centric model. Under Delaware law, the board of directors manages the business and affairs

---

[43] *See, e.g.*, *Fortis Advisors*, 2019 WL 7290945, at *4 ("the carve-out reveals that the parties knew how to expressly confer third-party beneficiary status, and the Court presumes that excluding the former Rempex equityholders from the carve-out was intentional"); *see also Daniel v. Hawkins*, 289 A.3d 631, 653 (Del. 2023) (finding that because drafters used specific language to restrict a certain transfer, "the parties knew how to restrict a transfer of the Majority Shares but only elected to apply that restriction to a narrow set of transfers"); *Delmarva Health Plan, Inc. v. Aceto*, 750 A.2d 1213, 1216 & n.12 (Del. Ch. 1999) (recognizing that the *expressio unius est exclusio alterius* canon applies in the contractual interpretation context).

[44] *See Orban v. Field*, 1993 WL 547187, at *9 (Del. Ch. Dec. 30, 1993) (rejecting argument that stockholder had third-party beneficiary status to enforce a merger agreement, stating that "[t]he idea of shareholders having directly enforceable rights as third[-]party beneficiaries to corporate contracts is . . . one that should be resisted" as "[o]ne of the consequences of the limited liability that shareholders enjoy is that the law treats corporations as legal persons not simply agents for shareholders"); *see also Amirsaleh*, 2008 WL 4182998, at *4 (observing that this court has "previously bristled at the notion that a stockholder could have 'directly enforceable rights as third-party beneficiaries to corporate contracts'" (quoting *Orban*, 1993 WL 547187, at *9)).

11

of the corporation,[45] which extends to litigation assets.[46] As one manifestation of this board-centric model, Delaware law imposes the demand requirement on stockholders who seek to stand in the shoes of a corporation for litigation purposes generally, including to enforce a corporate contract.[47] Deeming stockholders third-party beneficiaries of corporate contracts, and thus granting them the concurrent right to enforce that contract alongside the company, risks unsettling the board-centric model by encroaching on the board's authority over litigation assets. It also risks creating a path by which stockholders could readily circumvent the demand requirement, which has been carefully developed and fine-tuned over decades of jurisprudence.

There are also practical considerations guiding the court's reticence to extend third-party beneficiary status to stockholders. Doing so could lead to a proliferation of stockholder suits in a variety of commonplace scenarios, which would no doubt give rise to considerable inefficiencies both for specific entities and the system as a whole. This, in turn, could increase the cost of business for corporations.

Thus, although a stockholders' equity stake does not "automatically disqualif[y] a stockholder from demonstrating third-party beneficiary status to a

---

[45] 8 *Del. C.* § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation.").

[46] *See generally Aronson v. Lewis*, 473 A.2d 805, 811–12 (Del. 1984), *overruled in part by Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000).

[47] Ct. Ch. R. 23.1; *see also United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021) (articulating requirements for stockholder to sue on behalf of corporation without first making demand on board).

corporate contract,"[48] this court has extended third-party beneficiary status to stockholders under corporate contracts in limited circumstances.[49]

Merger agreements might be viewed as unique among corporate contracts because stockholders are, undeniably, the intended economic beneficiaries of those agreements. After all, merger agreements involve the payment of consideration directly to stockholders. In a Delaware corporation, that benefit to stockholders marks the satisfaction of the board's fiduciary obligations to them and is a material part of the parties' purpose in entering into the contract. Indeed, delivering this benefit to stockholders is typically the target corporation's purpose for entering into a merger agreement. Moreover, stockholder suits challenging merger transactions do not implicate the demand requirement applicable in derivative suits.

Yet it is these unique aspects of merger agreements that enhances the need to recognize the contractual primacy of the board of directors in the sale context. In that context, a board has the obligation to "undertak[e] a logically sound process to get the

---

[48] *Arkansas Teacher Ret. Sys. v. Alon USA Energy, Inc.*, 2019 WL 2714331, at \*12 (Del. Ch. June 28, 2019).

[49] *See Crispo*, 2022 WL 6693660, at \*3 (discussing *Arkansas Teacher Ret. Sys.*, 2019 WL 2714331, at \*12–14 (granting stockholders third-party beneficiary standing to enforce a corporate contract); *Dolan v. Altice USA, Inc.*, 2019 WL 2711280 (Del. Ch. June 27, 2019) (declining to dismiss stockholder claim seeking to enforce a corporate contract and calling for extrinsic evidence to assess stockholder's third-party beneficiary status); *Amirsaleh*, 2008 WL 4182998, at \*4–5 (granting former member of the Board of Trade of the City of New York third-party beneficiary standing under corporate contract)); *see also Orban*, 1993 WL 547187, at \*9 (cautioning against granting stockholders third-party beneficiary standing under corporate contracts).

best deal that is realistically attainable."[50]  When exercising its fiduciary duties to stockholders in that context, a board should not be constrained by the possibility that a multitude of individual stockholders might seek to sue a buyer directly under the merger agreement.  Thus, no-third-party-beneficiaries provisions are arguably entitled to greater weight in the context of merger agreements, where they are adopted "to prevent collective action and agency problems that would result from giving shareholder standing to enforce merger agreements[.]"[51]

---

[50] *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 192 (Del. Ch. 2007); *see also* J. Travis Laster, *Revlon Is a Standard of Review: Why It's True and What It Means*, 19 Fordham J. Corp. & Fin. L. 5 (2013) (discussing the nuances of *Revlon*).

[51] Arthur Fleischer et al., *Takeover Defense: Mergers and Acquisitions* § 19.06[C] at 207 (9th ed. 2022) [hereinafter after "*Takeover Defense*"]; *see also* Kevin Miller, *The ConEd Decision – One Year Later: Significant Implications For Public Company Mergers Appear Largely Ignored*, The M&A Lawyer (October 2006), Westlaw ("[B]oth acquirors and targets abhor granting third-party beneficiary rights to target shareholders for fear that such rights would deprive the acquiror and the target of the ability to control the transaction prior to the effective time and, if necessary, renegotiate the terms of a still desirable transaction following a change in circumstance[.]"); Ryan D. Thomas & Russell E. Stair, *Revisiting Consolidated Edison--A Second Look At The Case That Has Many Questioning Traditional Assumptions Regarding The Availability Of Shareholder Damages In Public Company Mergers*, 64 Bus. Law. 329, 331–32 (2009) [hereinafter "*Revisiting Consolidated Edison*"] (suggesting that practitioners have assumed the courts would "recognize that the purpose of the 'no third-party beneficiaries' provision is to avoid the collective action and agency problems that would result from giving shareholders standing to sue under the merger agreement"); Glenn West, *On Naval Ramming Bows and Contractual Boilerplate—Are Standard "No Third-Party Beneficiary" Clauses Always a Good Thing?*, Weil Insights, Weil's Global Private Equity Watch, https://privateequity.weil.com/insights/naval-ramming-bows-contractual-boilerplate-standard-no-third-party-beneficiary-clauses-always-good-thing/  (June 19, 2017) (suggesting that "to avoid any arguments by putative third-party beneficiaries regarding their status . . . presumably was the motivation for the original drafter to create the 'no third-party beneficiary' clause that is now so common in most M&A-related agreements").

## C.    The Lost-Premium Provision

Section 9.7 of the Merger Agreement is a no-third-party-beneficiaries provision.[52]  Section 9.7 comprises a blanket prohibition disclaiming third-party beneficiaries followed by three carve-outs.[53]

The blanket prohibition states that the Merger Agreement "shall not confer upon any Person other than the parties hereto any rights or remedies hereunder[.]"[54]

The three carve-outs of Section 9.7 of the Merger Agreement render it more customized than other no-third-party-beneficiaries provisions enforced by this court. In *Fortis Advisors LLC v. Medicines. Co., & Melinta Therapeutics, Inc.*, for example, the court enforced a provision that contained a single carve-out.[55]  There, the court observed that the "negative implication" of the one carve-out was that "other third parties are not intended beneficiaries."[56]  The presence of three carve-outs in Section 9.7 makes the negative implication stronger.

Moreover, one of the carve-outs of Section 9.7 identifies stockholders as third-party beneficiaries in a limited scenario not implicated here.  Section 9.7(B) identifies "Company Related Parties (with respect to Section 8.3)" as third-party beneficiaries.[57]

---

[52] Merger Agr. § 9.7 (emphasis omitted).

[53] *Id.*  Those carve-outs provide: "(A) the D&O Indemnified Parties (with respect to Section 6.6 from and after the Effective Time), (B) the Company Related Parties (with respect to Section 8.3) are third-party beneficiaries and (C) the Parent Related Parties (with respect to Section 8.3) are third-party beneficiaries."  *Id.*

[54] *Id.*

[55] *Fortis Advisors LLC*, 2019 WL 7290945, at *4.

[56] *Id.* (citation omitted).

[57] Merger Agr. § 9.7(B).

The term "Company Related Parties" is defined in Section 8.3(c)(i) of the Merger Agreement to expressly include "stockholders."[58] No other definitions in the Merger Agreement are defined to include "stockholders." Section 8.3(c)(i) serves to protect stockholders from liability in the event of a failure to consummate the Merger Agreement by limiting the buyer's remedy.[59] The inference from Section 9.7's inclusion of stockholders as third-party beneficiaries expressly for purposes of protecting them from liability is that stockholders are not third parties in other contexts.[60]

Combined with the title of the section, "No Third-Party Beneficiaries," these aspects of Section 9.7 signal an intent to disclaim stockholders as third-party beneficiaries. For these reasons, the Dismissal Decision held that Section 9.7 operates to foreclose granting third-party beneficiary status to stockholders seeking to pursue a claim for specific performance under the Merger Agreement.[61]

In light of the Lost-Premium Provision, however, the Dismissal Decision did not resolve the question of whether Section 9.7 eliminates stockholder standing to pursue damages claims.[62] The Lost-Premium Provision is found in Section 8.2 of the

---

[58] *Id.* § 8.3(c)(i).

[59] *See id.*

[60] *See Fortis Advisors*, 2019 WL 7290945, at *4 ("The negative implication created by [the contract's] express inclusion of Financing Sources as third-party beneficiaries is that other third parties are not intended beneficiaries." (citing *Delmarva Health Plan, Inc.*, 750 A.2d at 1216 & n.12)).

[61] *Crispo*, 2022 WL 6693660, at *11.

[62] *Id.*

Merger Agreement titled "Effect of Termination."[63] Section 8.2 makes the Merger Agreement void in the event of termination and broadly eliminates liability with two exceptions: a "Specified-Provision Exception" and, relevant here, a "Bad Conduct Exception."[64] Generally, a Bad Conduct Exception "preserves the full panoply of contract damages, including expectation damages, in the event of a willful breach."[65] The Bad Conduct Exception contains the Lost-Premium Provision, providing that Defendants' termination shall not relieve Defendants from liability and damages for any knowing and intentional breach of the Merger Agreement, including liability and damages for "the benefits of the transactions contemplated by this Agreement lost by the Company's stockholders . . . including lost stockholder premium[.]"[66]

The Lost-Premium Provision language "suggests that the parties to the Merger Agreement intended that the stockholders be restored to the same position they would have been in had the Merger Agreement been fully performed."[67] There is an argument based on the general/specific canon that the more specific language of the Lost-Premium Provision modifies the more general (albeit customized) language of Section 9.7 by granting stockholders third-party beneficiary status for the limited

---

[63] Merger Agr. § 8.2.

[64] *Id.*

[65] *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, 2020 WL 7024929, at *104 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

[66] Merger Agr. § 8.2.

[67] *Crispo*, 2022 WL 6693660, at *9.

17

purpose of pursuing lost-premium damages.[68] Consequently, the Dismissal Decision noted that the Lost-Premium Provision "provides Plaintiff's strongest argument that the parties to the Merger Agreement intended to confer some form of third-party beneficiary status to Twitter stockholders."[69]

Plaintiff argues that the Dismissal Decision's acknowledgment that the Lost-Premium Provision provided the "strongest argument" for stockholder third-party beneficiary status constituted a holding that Plaintiff's claim was meritorious when filed.[70] But Plaintiff reads way too much into the court's relative assessment. Describing an argument as the "strongest" does not deem an argument "successful." It does not even deem the argument "strong." The Dismissal Decision did not resolve Defendants' Rule 12(b)(6) motion as to the lost-premium damages claim. Rather, because the theoretical complications posed by the Lost-Premium Provision were not addressed by the parties in dismissal briefing, the court requested supplemental briefing on the issue. Supplemental briefing never occurred, forcing further examination of the Lost-Premium Provision.

The Lost-Premium Provision is a form of provision that transactional attorneys began to use in response to the Second Circuit's decision in *Con Ed*.[71] There, the stockholders of Northeast Utilities sued Consolidated Edison for the $1.2 billion

---

[68] *See* Pl.'s Opening Br. at 21–23.

[69] *Crispo*, 2022 WL 6693660, at *9.

[70] Pl.'s Opening Br. at 22–23.

[71] 426 F.3d 524.

18

premium that Consolidated Edison would have paid had the deal closed.[72]  Applying New York law, the federal trial court held that the stockholders had standing as third-party beneficiaries to sue for lost stockholder premium.[73]

The Second Circuit reversed on appeal, concluding based on a no-third-party-beneficiaries provision, that Northeast Utilities' stockholders lacked third-party beneficiary status to enforce the merger agreement.[74]  The provision at issue contained a blanket prohibition subject to two carve-outs.[75]  One of the carve-outs dealt with personal liability and was not at issue.[76]  The other carve-out granted stockholders standing to enforce the right to receive cash or stock in the post-merger entity, but that right did not arise until the contractually defined "Effective Time" (which only occurred at the completion of the merger) and thus never arose.[77] Because neither of the carve-outs applied, the court enforced the blanket prohibition, holding that the stockholders lacked standing to sue Consolidated Edison for breach of the merger agreement.[78]

*Con Ed* came as a surprise to M&A practitioners "who believed that a merger premium (or some amount of shareholder damages) would be recoverable against a

---

[72] *Id*. at 527.

[73] *Con Ed*, 249 F.Supp.2d 387, 416–17 (S.D.N.Y. 2003), *rev'd in part*, 426 F.3d 524.

[74] *Con Ed*, 426 F.3d at 527–31.

[75] *Id.* at 527–28.

[76] *Id.*

[77] *Id.*

[78] *Id.* at 527–31.

buyer such as *Con Ed* who wrongly terminates or breaches a merger agreement[,]" notwithstanding the fact that most merger agreements contained broad no-third-party-beneficiaries provisions.[79] The ability to hold a buyer liable for lost-premium damages was viewed as a valuable tool for deterring buyers from backing out of a deal. By foreclosing the possibility of lost-premium damages under a common form of merger agreement, *Con Ed* threatened a significant tool that a target might leverage to force a buyer to consummate a deal.

One group of practitioners described the concerns raised by *Con Ed* as follows:

> If *Con Ed* proves to have established a general rule precluding the recovery of shareholder damages for a buyer's breach of a merger agreement, the potential consequences to targets in merger transactions would be substantial—shifting the balance of leverage in any MAC, renegotiation, or settlement into an 'option' deal such that the buyer could walk away with little consequence.[80]

This "option deal" problem caused by *Con Ed* led M&A attorneys who represent targets to go in search of solutions. They crafted *Con Ed* provisions, which aimed to make clear that the parties to the contract intended for the buyers to be liable for lost stockholder premium in the event of a busted deal.[81] *Con Ed* provisions became so

---

[79] *Takeover Defense* § 19.06[C] at 206–07 (citing *Revisiting Consolidated Edison* at 329).

[80] *Revisiting Consolidated Edison* at 332.

[81] Victor I. Lewkow & Neil Whoriskey, *Left at the Altar: Creating Meaningful Remedies for Target Companies*, The M&A Lawyer (October 2007), Westlaw [hereinafter "*Lewkow & Whoriskey*"]; *see also, generally*, Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 15A.03 (2023 ed.) [hereinafter "*Kling & Nugent*"].

common that they were defined in *The Book of Jargon: Global Mergers &*
*Acquisitions*, published by one leading M&A firm.[82]

By 2007, at least three types of *Con Ed* approaches had emerged. One
approach was to expressly provide shareholders with third-party beneficiary status,[83]
but practitioners were wary of this approach for the same reasons that Delaware law
is reticent to grant stockholder third-party beneficiary status. Buyers were concerned
by the potential proliferation of lawsuits against them. Sellers were concerned that
those lawsuits would undermine the ability of the target board to control the litigation
asset and secure a favorable outcome.[84]

---

[82] *See* Latham & Watkins, *The Book of Jargon: Global Mergers & Acquisitions* at 51 (1st ed. 2018), https://www.lw.com/admin/Upload/Documents/Global-MnA-Book-of-Jargon_2018.pdf [hereinafter "*The Book of Jargon*"].

[83] *Takeover Defense* § 19.06[C] at 210. A recent example of this approach can be found in the Smucker/Hostess merger agreement. *See Agreement and Plan of Merger by and among The J.M. Smucker Company, Hostess Brands, Inc. and SSF Holdings, Inc.* § 10.08 (Sept. 10, 2023), https://www.sec.gov/Archives/edgar/data/91419/000119312523233050/d507779dex21 .htm ("each stockholder of the Company shall be a third-party beneficiary of this Agreement for the purpose of pursuing claims for damages (including for the lost stockholder premium) under this Agreement in the event of a failure by Parent or Merger Sub to irrevocably accept for purchase all shares of Company Common Stock validly tendered").

[84] *See generally Lewkow & Whoriskey* ("[N]either buyer nor target has any interest in permitting target stockholders to pursue claims for breach independently" because the "[t]arget will want to preserve for itself the right to control this critical litigation-including the right to settle such litigation . . . and [b]uyer will not want to negotiate/litigate with potentially unorganized and uncoordinated groups of shareholders should a breach be alleged."); *Kling & Nugent* § 15A.03 at 7–8 ("The reason for not making target stockholders third-party beneficiaries is clear. It is one thing to have a single litigation with the target itself in a jurisdiction that has been negotiated and agreed upon between the parties if the parties have a dispute, for example, concerning an alleged failure of a closing condition. It is quite another to

A second approach was to make the target the agent for recovering damages on behalf of its stockholders, but this approach rested on shaky ground.[85] That is because there is no legal basis for allowing one contracting party to unilaterally and irrevocably appoint itself as an agent for a non-party for the purpose of controlling that party's rights.[86]

A third approach was to define damages resulting from breach in terms of lost premia.[87] The Lost-Premium Provision is a version of the damages-definition

have to deal with hundreds of lawsuits all around the country from disgruntled target shareholders.").

[85] *Takeover Defense* § 19.06[C] at 209–10 (describing the "agency" approach as intended "to clarify that the target company's damages include shareholder damages while avoiding the agency and collective action risks of naming the shareholder as express beneficiaries" (citing *Revisiting Consolidated Edison* at 350)).

[86] *Id.* at 210 (noting that it was unclear "whether a court would allow a target company to irrevocably appoint itself as an agent of its shareholders for purposes of controlling the enforcement of the shareholders' rights" (citing *Lewkow & Whoriskey*)). Corporate law has supplied a work around to this issue for some purposes. *See Aveta Inc. v. Cavallieri*, 23 A.3d 157, 177 (Del. Ch. 2010) (recognizing that merger consideration can be made contingent on facts ascertainable outside the merger agreement, which can be a determination by a party on behalf of all stockholders). Perhaps corporate law could supply a solution here. Would a charter provision designating the company as the stockholders' agent for the purpose of recovering lost-premium damages after failed sale achieve the result intended by the second approach? *See* 8 *Del. C.* § 102(b)(1) (permitting "any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders, or the governing body, members, or any class or group of members of a nonstock corporation; if such provisions are not contrary to the laws of this State").

[87] *Takeover Defense* § 19.06[C] at 211 (describing the "damages" approach, which "define[s] the target company's damages by reference to its shareholders' lost merger premium or to the 'benefit of the bargain' lost by its shareholders" (citing *Lewkow & Whoriskey*)).

approach.[88]  It defines liability and damages with reference to "the benefits . . . lost by the Company's stockholders [] taking into consideration . . . lost stockholder premium[.]"[89]

Commentators describing the damages-definition approach agree that it was not intended to grant stockholders third-party beneficiary status.[90]  Indeed, the damages-definition was viewed as an alternative to the first *Con Ed* approach that made stockholders third-party beneficiaries for the limited purpose of recovering lost-premium damages.  Transactional attorneys Victor I. Lewkow and Neil Whoriskey observed that, although "several major variants of the [*Con Ed*] remedies language" emerged, "*none* that [they had seen] grant target shareholders the right to enforce

[88] *Compare* Merger Agr. § 8.2 *with Lewkow & Whoriskey* (describing the "damages" approach).

[89] Merger Agr. § 8.2.

[90] Plaintiff argues that commentary concerning the meaning of various contractual terms constitutes "extrinsic evidence" that "cannot be relied upon in determining a motion to dismiss."  Pl.'s Opening Br. at 25.  Yet just as a court may look to dictionaries for assistance in determining the plain meaning of terms, *see Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738–41 (Del. 2006), a court may look to customary and reliable secondary sources to discern how contractual provisions are commonly used among negotiating parties.  *See, e.g.*, *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1060 (Del. 2023) (citing *Practical Law, Rossman & Moskin's Commercial Contracts,* and *Kling & Nugent* to inform the meaning of stock option agreements); *Chicago Bridge & Iron Co., N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 921 (Del. 2017) (citing *Freund's Anatomy of a Merger* to inform the meaning of a purchase agreement); *ev3, Inc. v. Lesh*, 114 A.3d 527, 530–31 (Del. 2014), *as revised* (Apr. 30, 2015) (citing *Kling & Nugent*, *Feldman & Nimmer's Drafting Effective Contracts*, and *Gutterman's Business Transactions Solutions* to inform the meaning of a merger agreement); *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1219 (Del. 2012) (citing *Kling & Nugent*, *ABA Mergers and Acquisitions Committee*, and academic articles to inform the meaning of confidentiality agreements).

the merger contract directly[.]"[91]  A leading treatise endorsed this view and similarly commented that the "damages definition approach" "does not grant the target shareholders third-party beneficiary status, but rather attempts to define the target company's damages by reference to its shareholders' lost merger premium or to the 'benefit of the bargain' lost by its shareholders."[92]  Damages-definition approaches that expressly define damages in terms of the *target*'s damages are in accord.[93]

## D.  Whether The Lost-Premium Provision Grants Plaintiff Third-Party Beneficiary Status

No court has addressed the effect of *Con Ed* provisions like the Lost-Premium Provision that follow the damages-definition approach.  Contractual provisions that define the type of damages for which a party might be liable are enforceable only to the extent they are consistent with principles of contract law.[94]  A contracting party

---

[91] *Lewkow & Whoriskey* (emphasis added).

[92] *Takeover Defense* § 19.06[C] at 211 (citing *Lewkow & Whoriskey*).

[93] *See, e.g.*, Martin D. Ginsburg, et al., 5 *Mergers, Acquisitions, and Buyouts* ¶ 2501 n.17 (December 2022 ed.) (noting that "[t]he parties [to a merger agreement] could also add a provision calling for Buyer to pay damages to *Target* (in case of Buyer's breach) equal to Target stockholders' lost premium, i.e., the stated purchase price less Target's post-breach value" (emphasis added)); Paul, Weiss, Rifkind, Wharton & Garrison LLP, *A Study of Selected U.S. Strategic M&A Transactions in the Wake of the Credit Crisis* at 13 (October 2009) (noting that, in 6% of surveyed transactions, "parties attempted to contract around [*Con Ed*]" by "provid[ing] that the measure of the *target's* damages should be the amount of its shareholders' lost consideration" (emphasis added)); *The Book of Jargon* (defining "*Con Edison Provision*" as "a provision in an Acquisition Agreement specifying that, in the event a Buyer breaches the agreement, the measure of damages to a *Target Company* is the loss suffered by the Target's shareholders" (emphasis added)).

[94] *See generally Restatement* § 339 cmt. f ("Attempts are sometimes made to conceal the fact that the amount specified in a contract is a penalty by using words indicating that the payment is merely one of two promised alternatives or that a large discount

24

cannot receive more than expectation damages.[95] "[E]xpectation damages [are] measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract."[96] A party cannot recover damages for consideration that it would not expect to receive had the contract been performed.[97]

---

is being allowed for a prompt payment. There is a borderline along which it is difficult to determine the question; *but payment of the specified amount will not be enforced if the court is convinced that it is a penalty* the purpose of which was to stimulate performance of a promise to do something else." (emphasis added)); Dan B. Dobbs, *Handbook on the Remedies: Damages—Equity—Restitution* § 12.5, at 821 (1973) ("Contracting parties often agree in their contract upon a formula for fixing damages in the event of breach, usually a formula at variance with the normal legal rule for damages or one that will afford damages to the non-breaching party even where he is unable to prove exactly what his damages may be. . . . . Such clauses stipulating damages are often valid and often enforced. . . . There are situations, however, in which agreed damage clauses are not valid at all. . . . [T]his includes agreements for damages unreasonably disproportionate to anticipate losses."); 3 *Dobbs Law of Remedies* § 12.9(1) at 245 (2d ed. 1993) [hereinafter "*Dobbs*"] ("Contract law generally attempts to respect the parties' self-determination by permitting the parties to contract and then by enforcing their promises. . . . However, the parties may not stipulate for damages that would be a 'penalty.'").

[95] *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) ("[T]he standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*.").

[96] *Id.* (citing *Restatement* § 347 cmt. a ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will . . . put him in as good a position as he would have been in had the contract been performed.")); *see also Leaf Invenergy Co. v. Invenergy Renewables, LLC*, 210 A.3d 688, 695 (Del. 2019) ("When determining expectation damages, courts determine an amount that will give the injured party 'the benefit of its bargain by putting that party in the position it would have been but for the breach.'" (quoting *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000)).

[97] 3 *Farnsworth* § 12.8 at 68–69 (4th ed. 2019) ("damages are generally limited to those required to compensate the injured party for lost expectation, for it is a fundamental tenant of the law of contract remedies that an injured party should not be put in a better position than had the contract been performed"); *Duncan*, 775 A.2d at 1022 (holding breach of contract damages are limited to the "promisee's reasonable

Such provisions are considered penalties. If a contractual provision defines damages to include penalties, then it is unenforceable.[98]

A target company has no right or expectation to receive merger consideration, including the premium, under agreements that operate like the Merger Agreement. The Merger Agreement provides that at the "Effective Time" (defined as the time when the parties file the certificate of merger with the Secretary of State), stock will be converted into the right to receive merger consideration.[99] Under this framework, no stock or cash passes to or through the target. Rather, merger consideration is paid directly to the stockholders. Accordingly, only a stockholder expects to receive payment of a premium under the Merger Agreement.

---

expectation of the value of the breached contract, and, hence, what the promisee lost").

[98] *See Restatement* § 356 cmt. a (stating that "parties to a contract are not free to provide a penalty for its breach[,]" and if the parties do so then that "penalty is unenforceable on grounds of public policy"); 11 *Corbin* § 58.1 at 397–98 (stating parties cannot contract for damages that function as penalties); 3 *Farnsworth* § 12.20 at 208–09 (stating where a contractual provision provides for a "stipulated sum [that] is significantly larger than the amount required to compensate the injured party for its loss," that contractual damages provision constitutes an unenforceable penalty); 24 *Williston* § 65:1 (stating "penal clauses are generally unenforceable"); 3 *Dobbs* § 12.9(2) at 247 ("If a provision for damages is a penalty, it will not be enforced."); *XRI Inv. Hldgs, LLC v. Holifield*, 283 A.3d 581, 661 (Del. Ch. 2022) ("[A] court generally will not enforce a contractual provision aimed at punishing or penalizing the breaching party, rather than compensating the non-breaching party." (citing *Restatement* §§ 355–36; *Del. Bay Surgical Servs., P.C. v. Swier*, 900 A.2d 646, 650 (Del. 2006); *Brazen v. Bell Atl. Corp.*, 695 A.2d 43, 48 (Del. 1997)), *rev'd in part on other grounds*, --- A.3d ---, 2023 WL 5761367 (Del. Sept. 7, 2023).

[99] Merger Agr. § 2.3(a); *id.* § 3.1(c) ("each share of Company Common Stock issued and outstanding immediately prior to the Effective Time (other than any Canceled Shares or Dissenting Shares) shall be converted into the right to receive $54.20 per share of Company Common Stock in cash").

Where a target company has no entitlement to a premium in the event the deal is consummated, it has no entitlement to lost-premium damages in the event of a busted deal. Accordingly, a provision purporting to define a target company's damages to include lost-premium damages cannot be enforced by the target company. To the extent that a damages-definition provision purports to define lost-premium damages as exclusive to the target, therefore, it is unenforceable. Because only the target stockholders expect to receive a premium in the event a merger closes, a damages-definition defining a buyer's damages to include lost-premium is only enforceable if it grants stockholders third-party beneficiary status.[100] It follows that the Lost-Premium Provision is unenforceable unless the Merger Agreement conveys third-party beneficiary status to stockholders.

Taking this logic a step further, one reasonable interpretation of the Merger Agreement is that the Lost-Premium Provision is unenforceable because the Merger Agreement does not confer third-party beneficiary status on stockholders. After all, Section 9.7 does not expressly confer third-party beneficiary status on stockholders and it is customized.[101] Delaware law is reticent to confer third-party beneficiary

---

[100] *Cf. Kling & Nugent* § 15A.03 at 6 ("But what about the target shareholders who may have lost a great premium if the Buyer walks from the deal and the target's trading price falls back down to the target's pre-deal trading level? Should not they be entitled to damages in this amount? *The answer depends on whether the target shareholders were third-party beneficiaries of the merger agreement. If not, the above analysis would seem to lead to the conclusion that the target shareholders are out of luck, although it is difficult to argue that the parties ever intended that this result (Buyer being able to breach with virtual impunity) would obtain.*" (emphasis added) (internal citation omitted)).

[101] *See Fortis Advisors LLC*, 2019 WL 7290945, at *4.

27

status on stockholders, and the reasons for this reticence are amplified in the context of merger agreements. When faced with the choice of how to handle stockholders' lost merger consideration in the event of a termination, the parties chose language that commentators describe as intended to avoid the perils of conveying third-party beneficiary status to stockholders. Because that language was untested, one possibility is that the parties took the risk that the provision would be unenforceable.

Although this interpretation of the Merger Agreement is facially reasonable, it presents a dilemma. It is a "cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions."[102] Concluding that stockholders lack third-party beneficiary status under the Lost-Premium Provision renders that provision unenforceable and thus fails to give it effect. This conclusion, therefore, fails to satisfy the cardinal rule of contract construction.

There is another possible construction, which involves interpreting the Merger Agreement as granting stockholders third-party beneficiary status that vest in exceptionally narrow circumstances and for the limited purpose of seeking lost-premium damages. As discussed above, third-party beneficiary status is a creature of contract and can be expressly or impliedly limited by the parties' contractual scheme. If stockholders had third-party beneficiary status to bring a claim for lost-

---

[102] *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1114 (Del. 1985) (citations omitted); *see also Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013) ("When interpreting contracts, we construe them as a whole and give effect to every provision if it is reasonably possible."); *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.").

premium damages, then such standing would be impliedly limited by the parties' contractual scheme.

The limitation necessarily implied by the Merger Agreement is that the drafters did not intend to vest stockholders with a right to enforce lost-premium damages while the company pursues a claim for specific performance. The parties stipulated to specific performance as to "prevent" breaches of the Merger Agreement, suggesting that a breach claim seeking lost-premium damages would not accrue unless specific performance was unavailable.[103] Likewise, a right to lost-premium damages is only referenced in relation to a monetary damages remedy applicable only if "this Agreement is terminated *and the Merger abandoned*[.]"[104] Further, the drafters chose a *Con Ed* approach that commentators identified as intended to eliminate stockholder interference with the target's ability to maximize its leverage under the Merger Agreement. Without this limitation, the stockholders' right to enforce the Lost-Premium Provision would undermine the manifest purpose of the Lost-Premium Provision—to solve the "option problem" by empowering the target to specifically enforce the deal or secure the best deal possible for stockholders.

In this alternative construction of the Merger Agreement, therefore, any third-party beneficiary status conferred on stockholders would not vest while the remedy of specific performance is still available. If, however, the deal is terminated and the remedy for specific performance is no longer available, because a court has denied the

---

[103] Merger Agr. § 9.9 (titled "Specific Performance").

[104] *See id.* § 8.2 (emphasis added).

relief or for other reasons, then a stockholders' right to pursue lost-premium damages would accrue. That right would run concurrent to the target's right to pursue damages under the merger agreement.[105]

This decision has identified two objectively reasonable interpretations of the Merger Agreement. Under either interpretation, Plaintiff lacked standing to enforce the Merger Agreement at the time he filed the complaint. Under the first interpretation, no stockholder had standing to enforce the Merger Agreement. Under the alternative interpretation, stockholders lacked standing to seek lost-premium damages while the company was pursuing a claim for specific performance.

The court need not determine which of these interpretations is most faithful to the parties' expectations. The purpose of this interpretive exercise is to determine whether Plaintiff's claim for lost-premium damages under the Merger Agreement was meritorious when filed. As discussed above, if stockholders are third-party beneficiaries to the Lost-Premium Provision, then their rights are necessarily limited by the parties' contractual scheme that forecloses stockholders from pursuing a claim for lost-premium damages while the company is seeking specific performance. Any contrary interpretation would be wholly unreasonable because it would eliminate the implied limitation of the Lost-Premium Provision necessary to reconcile that

---

[105] This alternative interpretation gives rise to the possibility that, once a merger is abandoned, a buyer might face claims for damages under the merger agreement from both the target and its stockholders. Stockholders, however, would be bound by the forum-selection provision in the merger agreement. *See supra* note 36. Accordingly, a single court would be handling both lawsuits and could deploy consolidation and scheduling solutions to manage inefficiencies.

provision with its purpose. Because Plaintiff's third-party beneficiary rights had not vested under the only reasonable interpretation of the Merger Agreement that conveys them, Plaintiff's claim was not meritorious when filed.[106]

## III.    CONCLUSION

Because Plaintiff's claim was not meritorious when filed, Plaintiff's motion for mootness fees is denied. This is the court's final judgment under Court of Chancery Rule 58.

---

[106] The parties focused most of their arguments in briefing over the question of whether Plaintiff's claim was ripe and relatedly whether Plaintiff had adequately alleged anticipatory repudiation. This decision does not address those arguments directly, but a party cannot claim anticipatory repudiation of a right that has not yet vested. Even if Plaintiff's enforcement right had vested, Plaintiff's claim had not yet ripened. That is because Twitter did not treat Musk's termination as repudiation but instead sought to specifically enforce the Merger Agreement. *See West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2009 WL 458779, at *5 n.37 (Del. Ch. Feb. 23, 2009) ("repudiation [only] ripens into a breach prior to the time for performance . . . if the promisee 'elects to treat it as such'" (alterations added) (quoting *Franconia Assocs. v. United States*, 536 U.S. 129, 143 (2002)); *Carteret Bancorp, Inc. v. Home Gp., Inc.*, 1988 WL 3010, at *6 (Del. Ch. Jan. 13, 1988) ("A suit seeking specific performance is, . . . in effect, an assertion not that the promisee elects to finalize the breach claimed and calculate his damages now, but rather that the promisee treats the mutual obligations as being still in force."). Plaintiff's claim of anticipatory repudiation, therefore, suffered many defects.